995 P.2d 816

Pauline Collins PERRY, Plaintiff–
Respondent,

v.

**MAGIC VALLEY REGIONAL MEDICAL
CENTER, a political subdivision of Twin
Falls County, Defendant–Appellant.**

No. 24709.

Supreme Court of Idaho,
Twin Falls, November 1999 Term.

Feb. 28, 2000.

Tolman Law Office, Twin Falls, for appellant. Jennifer K. Brizee argued.

May, Sudweeks, Kershaw & Browning, Twin Falls; Spence, Moriarity & Schuster,

Provo, Utah, for respondent. Lynn C. Harris argued.

KIDWELL, Justice.

Magic Valley Regional Medical Center (Hospital) appealed from the judgment in a medical malpractice case. The jury awarded plaintiff Pauline Collins Perry $1,550,000 in economic damages and $150,000 in non-economic damages for injuries to the sciatic nerve sustained from an injection that Hospital personnel administered in the gluteal area. We affirm and remand in part.

## I.

### FACTS AND PROCEDURAL HISTORY

Pauline Collins (now Pauline Collins Perry) (Perry) walked into the Hospital's emergency room on June 4, 1994 for treatment of an infected cut on her small toe. Because Perry had received no previous immunizations against tetanus, the emergency room physician ordered treatment with two tetanus shots, "DT" and "Hyper-Tet."

Hyper-Tet is administered to patients who have incomplete immunizations and are at risk of contracting tetanus. When it is administered in conjunction with a DT injection, Hyper-Tet is administered as an intramuscular injection in the gluteal region. The manufacturer and standard medical texts caution against injecting in the central gluteal region because of the risk of injuring the sciatic nerve.[1] The approved injection region is on the upper, outer quadrant of the hip.

Nurse Teresa Phillips administered the injections. In Hospital records, Phillips charted the Hyper-Tet injection as administered appropriately in the hip area. Perry claimed, however, that Phillips actually administered the injections in the middle of the right buttock. Pamela Babb, Perry's sister who had accompanied her to the emergency room, also testified that Phillips administered the injection in the buttock. Perry testified that she felt immediate, debilitating pain after the injection. She hopped out of the emergency room, assisted by Babb. Unable to obtain crutches from the hospital, Perry bought crutches within a few hours after the injection and used them for several days.

Perry visited the Hospital emergency room two weeks later for pain in her right leg. The physician prescribed codeine, amitriptyline, and large doses of ibuprofen. When the pain persisted and worsened in the following week, Perry visited a neurologist. She described a persistent pain in the right buttock and back of the leg and difficulty in walking, driving, and sitting. Perry acknowledged a history of chronic intermittent lower back pain but told the neurologist that she had no recent injury or exacerbation of that pain. The neurologist diagnosed right sciatica as a result of the Hyper-Tet injection. The neurologist prescribed stretches and more powerful painkillers and recommended an MRI and an epidural injection if Perry's pain symptoms persisted.

In the months and years that followed, Perry continued to experience extreme pain. She visited a long succession of doctors and hospitals attempting to obtain relief. By the beginning of 1998, she had visited doctors fifty-six times, had six operations, and had incurred $119,000 in medical expenses. She took Percocet, a powerful painkiller. An electrical device was implanted in her abdomen to control pain.

In 1995, Perry and her then-husband Steven Collins filed a complaint against the Hospital and the emergency room physician. They presented three claims: negligence, lack of informed consent, and loss of consortium. The physician moved for summary judgment, which was granted in September 1996.

Perry and Collins separated within months of filing the complaint. Divorce and child custody proceedings were not amicable. Clinical social worker Susan DeHaan performed a court-ordered child custody evaluation of each parent's fitness in the fall of 1995. Afterwards, Collins reached a settlement with the Hospital whereby he dropped his loss of consortium claim against the Hos-

---

1. The sciatic nerve is the largest nerve in the body and runs from the pelvis down the back of each thigh.

pital for $15,000. His deposition, in which he made many statements unfavorable to Perry's claim, was taken the following day. In his deposition, he mentioned DeHaan's unfavorable view of Perry. Thereafter, the Hospital listed DeHaan as a fact and expert witness. The trial court dismissed Collins as a party on September 15, 1997. The Hospital filed a motion in limine to exclude evidence of the amount and terms of the settlement agreement. The trial court ruled that the settlement could not be mentioned during voir dire or Perry's case in chief, but deferred until trial a decision about using the settlement during cross-examination. At trial, the court granted the Hospital's motion in part.

After a prolonged period of discovery, Perry filed her first pre-trial motions on August 28, 1997. Perry moved to compel the Hospital to supplement discovery and to exclude witnesses for failure to supplement discovery. Accusing the Hospital of attempting to transform the proceedings from a medical malpractice case to character assassination, Perry charged that the Hospital was dragging its feet on discovery and hiding witnesses and evidence.

At a deposition, DeHaan expressed an opinion that Perry suffered from a character disorder affecting her truthfulness about pain. Perry moved for a protective order excluding DeHaan as a fact and expert witness, which the trial court denied. Perry also moved to exclude DeHaan from testifying as to character disorders. At a hearing to determine the basis for and admissibility of this evidence, the trial court held that DeHaan could not testify as to any disorder because her methodology was deficient.

The Hospital moved to have a psychiatrist, Richard Worst, perform a psychological examination of Perry, which the trial court allowed. Perry moved to exclude Worst's testimony. The trial court excluded Worst's testimony as more prejudicial than probative.

A jury trial took place between January 27 and February 7, 1998. The rancorous tone of the pretrial proceedings continued into the trial with Perry continuing to insist that the Hospital was deflecting the focus of proceedings from the elements of medical malpractice to attacking Perry's personal life. The Hospital objected to the reading of deposition testimony from Hospital nurses about the local standard of care, as well as to the testimony of Ann Petersen, Perry's nursing expert. The Hospital unsuccessfully attempted to introduce a videotape of Perry jet-skiing as impeachment evidence and to introduce testimony that Perry had given away some of her pain medication. The trial court disallowed the Hospital's attempt to use Perry's 1995 applications for unemployment insurance to impeach her testimony that she was unable to work. The Hospital also objected to many of the jury instructions as well as the special verdict form.

The jury deliberated one day before reaching its conclusion. It returned a special verdict finding that the actions of the Hospital and its agents were the proximate cause of Perry's injuries. The jury awarded Perry $1,550,000 in economic damages and $150,000 in non-economic damages. Judgment was entered on February 11, 1998.

After trial, Perry filed a memorandum of costs, claiming over $12,000 in costs as a matter of right and over $27,000 in discretionary costs. Perry also claimed prejudgment interest on $119,000. After a hearing on the Hospital's objection to the claimed costs, the trial court denied Perry's motion for prejudgment interest and awarded her $31,102.36 in costs.

The Hospital filed a motion for judgment notwithstanding the verdict and, in the alternative, motions for a new trial and remittitur of damages. After a hearing, the trial court denied each of the motions. The Hospital filed a timely notice of appeal.

## II.

### STANDARD OF REVIEW

This Court reviews challenges to a trial court's evidentiary rulings under the abuse of discretion standard. *Kozlowski v. Rush*, 121 Idaho 825, 827, 828 P.2d 854, 856 (1992). These include trial court decisions admitting or excluding expert witness testimony, *Morris By and Through Morris v. Thomson*, 130 Idaho 138, 144, 937 P.2d 1212,

1218 (1997); and excluding evidence on the basis that it is more prejudicial than probative, *Burgess v. Salmon River Canal Co.,* 127 Idaho 565, 573, 903 P.2d 730, 738 (1995). Error is disregarded unless the ruling is a manifest abuse of the trial court's discretion and affects a substantial right of the party. *Burgess,* 127 Idaho at 574, 903 P.2d at 739; *see also Hake v. DeLane,* 117 Idaho 1058, 1065, 793 P.2d 1230, 1237 (1990). To determine whether a trial court has abused its discretion, this Court considers whether it correctly perceived the issue as discretionary, whether it acted within the boundaries of its discretion and consistently with applicable legal standards, and whether it reached its decision by an exercise of reason. *See Lamar Corp. v. City of Twin Falls,* 133 Idaho 36, 40, 981 P.2d 1146, 1150 (1999).

▇ This Court reviews jury instructions to determine "whether the instructions, when considered as a whole, fairly and adequately present the issues of the case and state the applicable law." *Empire Lumber Co. v. Thermal-Dynamic Towers, Inc.,* 132 Idaho 295, 304, 971 P.2d 1119, 1128 (1998). Reversible error occurs if an instruction misleads the jury or prejudices a party. *Lawton v. City of Pocatello,* 126 Idaho 454, 462, 886 P.2d 330, 338 (1994). Whether the jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review. *State v. Bush,* 131 Idaho 22, 32, 951 P.2d 1249, 1259 (1997). However, whether a reasonable view of the evidence supports an instruction to the jury is within a trial court's discretion. *Id.*

### III.

### ANALYSIS

**A. The Trial Court Did Not Abuse Its Discretion in Ruling That Perry's Nursing Expert Was Qualified to Testify Regarding the Local Community Standard of Care for Administering Intramuscular Injections.**

▇ Ann Petersen, former executive director of nursing for the state of Utah, served as Perry's nursing expert and testified regarding the standard of care for administering intramuscular injections. Petersen testified that she had taken the following actions to determine the Twin Falls standard of care: reviewed the depositions of three Hospital nurses; reviewed a standard nursing text, *Fundamentals of Nursing* by Kozier et al. (the Kozier text), that Hospital nurses identified as their standard for nursing procedures; talked with the executive director of the Idaho Board of Nursing; and spoke with nursing faculty members at two Idaho nursing schools to determine whether the Twin Falls standard for administering intramuscular injections differed in any way from the national or state-wide standard. Overruling the Hospital's objection, the trial court ruled that Petersen was qualified to testify regarding the local community standard of care. The Hospital contends that Petersen lacked a sufficient foundation to testify because she did not speak with anyone in Twin Falls about the local standard of care.

▇ Experts testifying as to the standard of care in medical malpractice actions must show that they have familiarized themselves with the standard for a particular profession for the relevant community and time. *See Kolln v. Saint Luke's Reg'l Med. Ctr.,* 130 Idaho 323, 331, 940 P.2d 1142, 1150 (1997). They must also state how they became familiar with the standard of care for the particular health care professional. *Id.*

▇ A common means for an out-of-area expert to obtain knowledge of the local standard of care is by inquiring of a local specialist. *See, e.g., Watts v. Lynn,* 125 Idaho 341, 347, 870 P.2d 1300, 1306 (1994); *Strode v. Lenzi,* 116 Idaho 214, 216, 775 P.2d 106, 108 (1989). This is not, however, the only means for obtaining knowledge of the local standard of care. An expert's review of a deposition stating that the local standard does not vary from the national standard, coupled with the expert's personal knowledge of the national standard, is sufficient to lay a foundation for the expert's opinion. *See Kozlowski,* 121 Idaho at 828–29, 828 P.2d at 857–58. *See also Rhodehouse v. Stutts,* 125 Idaho 208, 212, 868 P.2d 1224, 1228 (1994) (stating that, although the reviewed deposition was defec-

tive, "it may be possible for an expert to become familiar with the local standard of care by reviewing the defendant doctor's deposition.").

Here Petersen reviewed the depositions of three Hospital nurses and then reviewed the text upon which they relied. Marlys Massey, the Hospital's nursing director for the emergency department, helped formulate Hospital nursing policies and co-authored the Hospital emergency room's Nursing Policy and Procedure Manual. In her deposition, Massey testified that the standard for intramuscular injections at the Hospital was the same way that nursing curricula throughout the United States taught the technique. She agreed that the Kozier text provided the basic manner, applicable anywhere in the country, for giving intramuscular injections, and that the local standard was the same as the universal standard. Massey also testified that she would refer nurses specifically to the Kozier text for brush-up on intramuscular injection techniques. Janie Draney, the Hospital's nursing administrator, testified in her deposition that, if the Hospital did not have a written policy or guideline in effect for a particular procedure, she would advise a nurse to consult the most current best method in a core reference text such as the Kozier text. In her deposition, Teresa Phillips testified that the Hospital used the Kozier text, which she stated was "the nursing standard for injection ... as far as selecting sites." Petersen's reading of the nurses' depositions, coupled with her subsequent review of the text identified by the nurses as providing the standard for intramuscular injections, gave her a sufficient foundation to testify to the local standard of care.

Therefore, the trial court did not abuse its discretion in ruling that Petersen was qualified to testify regarding the local community standard of care.

### B. Petersen Did Not Testify as to Causation.

The Hospital asserts that the trial court erroneously allowed nursing expert Petersen to testify as to medical causation. The Hospital asserts that the following question constituted a causation question: "Based upon reasonable medical probabilities, do you have an opinion as to whether the method, manner and mode of injection ... was or was not below the standard of care?" In reply, Petersen first noted that, because she was not a physician, she could not "document" the cause of the injury. She went on to say, "[I]f you give the injection correctly, you do not have sciatic injury." This testimony varies little from Petersen's earlier testimony that intramuscular injections are administered in the upper outer quadrant to avoid the risk of injuring the sciatic nerve. Neither the question nor the answer suggests that Phillips' injection was the cause of Perry's injury.

Because Petersen did not testify as to causation, the trial court did not abuse its discretion in allowing the preceding testimony.

### C. The Trial Court Did Not Abuse Its Discretion in Excluding a Videotape by the Hospital's Investigator.

■■■ Discovery in this case was extensive and often contentious. Perry repeatedly charged that the Hospital was uncooperative in responding to discovery requests. Finally, four months before trial, Perry filed a motion to compel the Hospital to supplement discovery. Stating that the Hospital had insinuated that it would use evidence that Perry lacked at trial, Perry urged the court to compel for reasons of judicial economy and avoiding "trial by ambush." In a subsequent memorandum, Perry noted that the Hospital "continues to attempt to hide witnesses under the guise of 'rebuttal' or 'impeachment' witnesses." At a hearing on the motion, the Hospital reiterated its intention to reserve the right to call undisclosed witnesses for impeachment. After hearing argument, the trial court ordered the parties to disclose additional witnesses by November 20. It also ruled that the Hospital could not call surprise witnesses until good cause was shown as to why the witness was not divulged to Perry.

During direct examination at trial, Perry testified that she loved to snowmobile and jet-ski. Despite her injury, she continued to engage in these vigorous activities. On cross-examination, she testified that she jet-

skied about four times in the summer of 1997 and loved to go fast. When questioned specifically whether she had jet-skied at Mantua, a small lake in Utah, she initially could not remember; then she stated that she sat on the dock visiting with family while others skied.

Three days after this cross-examination, the Hospital sought to introduce a videotape plus the testimony of Craig Coash, the private investigator who made the videotape. The lengthy videotape showed Perry jet-skiing at Mantua on August 8, 1997. The Hospital claimed that the videotape, along with Coash's foundational testimony, was "pure impeachment" because Perry testified incorrectly about her Mantua visit. When Perry objected to the videotape and Coash's testimony, the trial court sustained the objection and excluded the evidence as a discovery sanction.

The Hospital asserts that the trial court erred in excluding the videotape and Coash's testimony because the rules of civil procedure in effect at the time of the trial did not require disclosure of impeachment exhibits and witnesses.

■ I.R.C.P. 26(e) governs the supplementation of responses. A trial court may order parties to supplement their discovery responses. I.R.C.P. 26(e)(3). If a party fails to provide timely supplementation, the trial court may impose sanctions, including the exclusion of witness testimony. I.R.C.P. 26(e)(4). Failure to comply with this rule typically results in the proffered evidence being excluded. *Radmer v. Ford Motor Co.,* 120 Idaho 86, 89, 813 P.2d 897, 900 (1991). A trial court's determination of whether I.R.C.P. 26(e) has been violated and its imposition of sanctions for violations are matters within its discretion. I.R.C.P. 26(e)(4); *Artiach Trucking, Inc. v. Wolters,* 118 Idaho 656, 658, 798 P.2d 938, 940 (Ct.App.1990).

The trial court considered the videotape to be direct evidence introduced under the guise of impeachment. It explained, "[T]his witness really wasn't an impeachment witness and could have been used by the defense in their case in chief, regardless of what the plaintiff testified to [regarding her activities at Mantua,] to show that the plaintiff wasn't hurt that bad and to show that the damages should be minimal, et cetera." The trial court was within its discretionary limits in making this assessment. The Hospital's attempt to characterize the videotape as impeachment, simply because Perry testified that she did not jet-ski on that particular lake, was somewhat disingenuous.

The trial court had ordered the parties to disclose additional witnesses by November 20, approximately two months before trial. At the time Perry filed the motion to compel, the Hospital knew of the existence of the videotape. Given the tenor and results of pretrial hearings, the Hospital should have known that sanctions were probable if either party violated the discovery orders. Nevertheless, the Hospital gambled on the possibility that it could show the videotape as impeachment evidence. When Perry objected, pointing out that this was the very type of evidence it sought to uncover through its motion to compel, the trial court took the matter under advisement and heard an offer of proof before sustaining the objection. After indicating that it did not consider the videotape to be impeachment evidence, the trial court noted that the Hospital had not shown good cause for not producing the evidence during the mandated disclosure period. Suggesting that the evidence would have been admitted if disclosed thirty days before trial, the trial court held that disclosure eight days into trial was unreasonable. Its discussion shows that the trial court exercised its reason and acted within the boundaries of its discretion consistent with the applicable legal standards. Accordingly, we find that the trial court did not abuse its discretion in excluding the videotape and Coash's testimony.

**D. The Trial Court Did Not Abuse Its Discretion in Limiting the Testimony of a Clinical Social Worker Who Did Not Have the Proper Foundation for Her Diagnosis of Perry.**

■ Susan DeHaan, a clinical social worker, conducted a child custody evaluation in Perry's divorce from Collins. She interviewed Perry twice in the fall of 1995. The

Hospital designated DeHaan as both a fact and an expert witness. At a deposition, DeHaan opined that Perry suffered from Munchausen's syndrome, a condition in which the sufferer feigns symptoms of disease.

Perry filed motions to strike DeHaan as a fact and expert witness and to exclude DeHaan from testifying as to character disorders. At a pretrial hearing, DeHaan repudiated her previous statement concerning Munchausen's syndrome because "I do not have any knowledge over the past two years of [Perry's] medical procedures or what she was doing. I would need to know more about the sequence of events, the context, the scenario of those procedures." Nevertheless, she opined that Perry had a somatoform disorder—that is, that her pain was not a consequence of a physical injury but was caused by a character disorder. DeHaan admitted, however, that a somatoform diagnosis usually required reviewing the patient's medical records and that she had not ruled out physical causes for Perry's pain.

The trial court ruled that DeHaan lacked the proper foundation to testify to a character disorder. The Hospital contends that DeHaan established a proper foundation to give an expert opinion and that the trial court abused its discretion in limiting DeHaan's testimony.

I.R.E. 702 allows a qualified expert to offer an opinion if specialized knowledge will assist the jury to understand the evidence or determine a fact in issue. I.R.E. 702. This Court reviews challenges to a trial court's evidentiary rulings under the abuse of discretion standard. *Kozlowski*, 121 Idaho at 827, 828 P.2d at 856. "[A] trial court has considerable discretion to exclude evidence for reasons of foundation...." *Burgess*, 127 Idaho at 574, 903 P.2d at 739.

The trial court held a lengthy hearing to determine whether DeHaan had a proper foundation for her expert opinion. Denying Perry's motions to exclude, the trial court allowed DeHaan to testify both as a fact and as an expert witness for the Hospital. It also rejected Perry's claim that DeHaan's testimony would be more prejudicial than probative. However, the trial court concluded that DeHaan's methodology was deficient

because she had not ruled out physical causes for Perry's symptoms. On this basis, it ruled that DeHaan could not testify as to a character disorder. The trial court did, however, allow DeHaan to testify as to her opinion as to Perry's reliability.

There was abundant evidence in the record that medical professionals usually reviewed medical records to confirm a diagnosis of character disorder. DeHaan admitted that she had not ruled out physical causes for Perry's behavior. Given this admission and the testimony that review of medical records was the usual procedure, the trial court's denial of DeHaan's diagnostic opinion because she had not performed "rule-outs" was an exercise of reason, supported by the record. *Cf. State v. Johnson*, 119 Idaho 852, 856, 810 P.2d 1138, 1142 (Ct.App.1991) (objection to foundation upheld where doctor had no expertise in area in which he would testify). The trial court did not abuse its discretion in limiting DeHaan's testimony.

**E. The Trial Court Did Not Abuse Its Discretion in Excluding the Testimony of the Hospital's Psychiatrist.**

▮ When DeHaan's deposition suggested that Perry might have a character disorder, the Hospital moved for a psychological examination of Perry pursuant to I.R.C.P. 35(a). The trial court granted the motion. Psychiatrist Richard Worst conducted the examination. At a deposition on January 23, 1998, Worst testified that Perry had a character disorder that could cause her to falsify and exaggerate where financial gain could be involved.

Perry made a motion in limine to exclude Worst's testimony. The trial court granted the motion to exclude based on its conclusion that the probative value of Worst's testimony was outweighed by its prejudicial value. The court repeated its ruling when the Hospital made an offer of proof at trial. The Hospital asserts that the trial court abused its discretion in excluding Dr. Worst's testimony both because the evidence was highly probative and because the court did not have adequate information when it excluded the evidence.

A trial court may exclude relevant information "if its probative value is substantially outweighed by the danger of unfair prejudice." I.R.E. 403. A trial court's exclusion of evidence under I.R.E. 403 is reviewed for an abuse of discretion. *Burgess,* 127 Idaho at 573, 903 P.2d at 738.

Worst diagnosed Perry with "personality disorder not otherwise specified," a category in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV). Worst thought that Perry came close to a named disorder within the DSM-IV. A diagnosis of the named disorder, however, required a showing of three out of seven named criteria; Worst believed that Perry exhibited only two of the criteria strongly enough for diagnostic purposes.

In an affidavit submitted to the court during trial, Worst stated that, if allowed to testify, he would testify as to his findings about Perry's history that were critical to his diagnosis of personality disorder. This history came almost entirely from third-person assertions about Perry's character and activities. The trial court had already disallowed direct testimony as to most of these areas of inquiry.

The history, grounded on hearsay, was the basis of Worst's diagnosis. Indeed, Worst testified that there was no evidence of psychiatric disorder when he personally examined Perry. Worst had administered a standard psychological exam, the Minnesota Multiphasic Personality Inventory (MMPI-II), to Perry but had not received the results at the time of his deposition. In his affidavit, Worst stated that the MMPI-II results validated his diagnosis. In his deposition, however, Worst had stated that he expected the MMPI-II results to show normal and asserted that he did not plan to rely on the MMPI-II results in forming his opinion.

The trial court did not have the benefit of Worst's two additional affidavits when it made its initial ruling that Worst's testimony was inadmissible. At that point, Worst had testified that he did not plan to rely upon the MMPI-II results. The only new information in the affidavits was Worst's statement that the MMPI-II results validated his previous diagnosis. When the Hospital made its offer of proof at trial, the trial court explicitly stated that it had considered the two affidavits. Therefore, the Hospital errs in asserting that the trial court excluded Worst's testimony based upon inadequate information.

Worst's diagnosis of "personality disorder not otherwise specified" was nebulous. Unlike Munchausen's syndrome, this diagnosis is not "well recognized in the medical literature." *Cohen v. Albert Einstein Med. Ctr.,* 405 Pa.Super. 392, 592 A.2d 720, 724 (1991); *accord United States v. Shay,* 57 F.3d 126, 129 (1st Cir.1995). Moreover, the diagnosis was based almost entirely on allegations and statements that the trial court had ruled inadmissible in direct testimony because their probative value was outweighed by their prejudicial effect.

The trial court recognized that Worst's diagnosis did have probative value. It considered the strength of the diagnosis in noting that the disorder did not rise to the level of Munchausen's syndrome. It concluded, however, that having an expert testify that Perry met a profile that showed a tendency toward dishonesty, manipulation and faking would be extremely prejudicial. The record shows that the trial court considered all the relevant evidence, recognized the probative value, and exercised its discretion in concluding that the probative value was outweighed by the prejudicial effect. We determine that the trial court did not abuse its discretion in excluding Worst's testimony.

**F.  The Trial Court Did Not Abuse Its Discretion in Excluding Testimony That Perry Occasionally Gave Away Prescription Pain Medication.**

The Hospital, in five separate offers of proof, sought to prove that Perry had given away some of her pain medication. The trial court excluded the testimony. It stated that the amount of pills given away was minimal, so the small probative value of the testimony would be outweighed by its prejudicial value. The Hospital asserts that the trial court abused its discretion in excluding the testimony because the amount given

away was not minimal and the testimony would have created an inference that Perry did not need the medication.

The Hospital did not introduce evidence to show the actual number of pills Perry received. The only evidence was that provided by Perry in the Hospital's offer of proof. There Perry testified that over the course of three and a half years, she received 120 pills per month most months and 30 pills per month for a few months. Even if Perry received 30 pills a month for almost a year, she would have received a total of over 4000 pills. Only one person claimed that Perry had given away more than ten pills. Perry herself claimed to have given away a total of eleven pills to two persons. Under the Hospital's offer of proof, Perry gave away approximately 100 pills. Weighed against this was the prejudicial effect that Perry had broken the federal law that prohibits dispensing medications without a prescription.

In ruling the evidence inadmissible, the trial court mentioned the small amount at issue and its willingness to reconsider if the Hospital brought forward evidence that Perry was selling or giving away wholesale quantities of pills. Because the amount of pills at issue was minimal, the trial court held that the probative value was outweighed by the prejudicial value. At most, Perry gave away 3% of her pills. Although reasonable persons could differ over the characterization of 100 pills as de minimis, such a characterization is within the trial court's discretion. This Court holds that the trial court did not abuse its discretion in excluding testimony that Perry occasionally gave away prescription pain medication.

### G. The Trial Court Did Not Abuse Its Discretion in Prohibiting the Use of Unemployment Documents to Refresh Perry's Recollection.

Perry's employment was terminated in the spring of 1995 for reasons unrelated to her physical symptoms. On cross-examination, Perry claimed that she was physically unable to work for the following three months, but she admitted that she received three unemployment checks during this period.

The Hospital grilled Perry about whether she represented to the State that she was physically able to work in order to receive unemployment benefits. Perry could not recall. When the Hospital sought to refresh her recollection with applications for unemployment benefits which Perry had signed, the trial court sustained the objection of Perry's counsel. On appeal, the Hospital asserts that it was prejudiced by not being able to have Perry testify that she had signed documents stating that she was physically able to work.

I.R.E. 612 allows a writing to be used to refresh the memory of a witness. "A party entitled to have a writing or object produced under this rule is entitled ... to introduce in evidence those portions which relate to the testimony of the witness." I.R.E. 612(c). The trial court sustained an objection to the unemployment documents on the basis that they were not previously disclosed as exhibits. Because the Hospital, as a matter of law, was entitled to introduce the documents into evidence once they had been used to refresh Perry's memory, the trial court was entitled to base its ruling on whether they could be admitted as exhibits.

The trial court did not abuse its discretion in refusing to allow use of the unemployment documents. Given the contentious nature of discovery in this trial and the recurring suggestion of evidence being withheld, the trial court considered whether there was a surprise necessity for admitting previously undisclosed exhibits. It noted that the Hospital had already made its point that Perry signed unemployment documents with their inculpatory representations. The trial court stated that it was not making a blanket ruling excluding all impeachment evidence. Finally, the trial court allowed the Hospital two means of impeaching Perry: the Hospital could instruct Perry as to the wording of the Idaho Code regarding unemployment benefits, and the trial court would instruct the jury as to the representations necessary to receive unemployment compensation. This ruling was an exercise of reason within the boundaries of the trial court's discretion.

### H. The Trial Court Did Not Abuse Its Discretion in Allowing Evidence of the Settlement Agreement Between Collins and the Hospital.

The Hospital made a motion in limine to preclude Perry from mentioning the fact that Collins and the Hospital had reached a settlement agreement. The trial court ruled that the settlement could not be mentioned during voir dire or during Perry's case in chief. It deferred until trial a decision concerning use of the settlement during cross-examination. During trial, the court stated that it would not allow Perry to bring out the amount of the settlement. It did, however, allow Perry to use the fact that Collins settled with the Hospital for money, along with any prior inconsistent statements in the pleadings, to be mentioned during impeachment. Collins testified for the Hospital, and Perry used the settlement for impeachment during cross-examination. On appeal, the Hospital asserts that admission of evidence concerning the settlement agreement was an abuse of discretion because Idaho courts admit disclosure only of "Mary Carter" agreements.[2]

A settlement agreement may not be offered into evidence to prove liability. I.R.E. 408. The rule does not require exclusion, however, "if the evidence is offered for another purpose, such as proving bias or prejudice of a witness." I.R.E. 408. Deciding whether a settlement agreement should be disclosed to a jury rests in the broad discretion of the trial court. *Doty v. Bishara*, 123 Idaho 329, 335, 848 P.2d 387, 393 (1992).

The Hospital asserts that Idaho case law bars introduction of settlement agreements unless they are "Mary Carter" agreements. This is not the law in Idaho. "[I.R.E.] 408 does *not* require exclusion of evidence relating to compromises . . . if the evidence being introduced is used to show witness bias or prejudice." *Soria v. Sierra Pac. Airlines*, 111 Idaho 594, 605, 726 P.2d 706, 717 (1986).

Our previous decisions clearly allow the disclosure of *any* settlement agreement to show bias, subject to abuse of discretion review. *See id.* at 606, 726 P.2d at 718 (emphasizing the broad discretion that trial courts possess in admitting or excluding evidence of settlement agreements); *Quick v. Crane*, 111 Idaho 759, 780, 727 P.2d 1187, 1208 (1986) (rejecting the argument that all settlements must be disclosed simply because a settling party is called as a witness, but noting that a trial court's determination of admissibility would be overturned only upon a clear showing of abuse). *See also Doty v. Bishara*, 123 Idaho at 335, 848 P.2d at 393 (where case was remanded on other grounds, stating in dicta, "Although we find no abuse of discretion in not disclosing the agreement, we leave to the discretion of the trial court on retrial the determination of whether the . . . [a]greement should be disclosed to the jury.").

The trial court carefully limited Perry's use of the settlement agreement. It prohibited mentioning the settlement agreement in voir dire, opening, or the case in chief. It allowed Perry to bring the agreement up on cross-examination only to show bias. The trial court invited the Hospital to submit a jury instruction stating that the settlement could be considered for bias and not for liability, and did in fact give such an instruction. These actions demonstrate that the trial court exercised reasoned judgment in the limited admission of this evidence to show bias or prejudice. Therefore, the trial court did not abuse its discretion in admitting evidence of the settlement agreement.

### I. The Trial Court Did Not Abuse Its Discretion in Allowing Perry to Read Portions of Depositions Into the Record.

Four court days after Ann Petersen testified, Perry moved to introduce specified portions of the depositions of Nurses Massey, Draney, and Phillips into the record. These

---

2. A "Mary Carter" agreement has three characteristics: (1) the agreeing defendant promises to remain a party until a verdict is reached or it has been released by the trial court or plaintiff; (2) the agreeing parties agree to keep the agreement secret; and (3) the agreeing defendant guarantees a certain recovery for the plaintiff. *Soria v. Sierra Pac. Airlines*, 111 Idaho 594, 603–04, 726 P.2d 706, 715–16 (1986).

excerpts went to the local standard of care for administering intramuscular injections. The trial court admitted the excerpts. The Hospital asserts that the trial court abused its discretion because its ruling did not address any of the concerns the Hospital raised in its objection. In addition, it contends that admission of the deposition testimony prejudiced the Hospital because it unduly emphasized Petersen's testimony and gave the Hospital no opportunity to cross-examine the deposed nurses.

The Hospital incorrectly asserts that the trial court did not address its stated objections. Perry sought to introduce the depositions under I.R.C.P. 32(a) as depositions by persons who were testifying on behalf of a corporation. The Hospital objected, claiming that the nurses were not corporate designees. The trial court ruled that it was admitting the depositions not under I.R.C.P. 32(a) but under I.R.E. 801, which allows statements from party agents who are not corporate designees. The Hospital objected that reading the depositions was equivalent to allowing Petersen to testify twice. The trial court noted that the deposition testimony could be used not only as foundation for Petersen's testimony, but also as a vicarious admission by the Hospital and independent evidence of the standard of care. Finally, the Hospital objected on the basis that the nurses were all available to testify in person and the use of depositions gave the Hospital no ability to cross-examine. The trial court noted that the Hospital could read other portions of the deposition to provide context and could question the nurses concerning the depositions when they took the stand.

The record shows, therefore, that the trial court thoughtfully addressed all the concerns raised by the Hospital in its objection to introducing the deposition testimony. The Hospital did, in fact, request additional reading from Draney's deposition to provide context for the excerpts introduced by Perry. All the nurses later testified for the Hospital and the Hospital questioned all three about the local standard of care. This gave the Hospital the opportunity to cure any possible misrepresentation that came from reading the depositions. Therefore, this Court holds that the trial court did not abuse its discretion in allowing Perry to read portions of the depositions of the Hospital's nurses into the record.

### J. The Jury Instructions Were Legally Sufficient.

#### 1. Instruction 11—Proximate Cause.

Instruction 11 stated:

> If ... Perry proves that [the Hospital] failed to meet the applicable standard of care, [she] has the additional burden of proving through expert testimony *and* a preponderance of all competent evidence that its failure to meet the applicable standard of care was a proximate cause of [her] injuries. (emphasis in original).

The Hospital contends that this instruction, by not including the words "to a reasonable degree of medical certainty," misstated the law because causation in a medical malpractice case must be proven to a reasonable degree of medical certainty. The Hospital does not assert that Perry's expert witnesses did not testify to a reasonable degree of medical certainty, but merely that these magic words must be in the jury instruction to adequately instruct the jury.

I.C. § 6–1012 requires medical malpractice plaintiffs to affirmatively prove a health care provider's negligence "by direct expert testimony and by a preponderance of all competent evidence." I.C. § 6–1013 then defines competent evidence. The definition includes the requirement that experts testify to their opinions to a reasonable medical certainty.

The wording "all *competent* evidence" is a legally sufficient instruction. In *Leazer v. Kiefer*, this Court stated that the following instruction (which does not mention reasonable medical certainty) accurately stated the standard of care pursuant to I.C. § 6–1012:

> The plaintiffs ... have the burden of proving, by direct expert testimony and by a preponderance of all competent evidence, that ... the defendant negligently failed to meet the applicable standard of health care.... In addition, the plaintiffs have the burden of proving that the negligence

of the defendant was a proximate cause of the injury and damage to the plaintiffs.

*Robertson v. Richards,* 115 Idaho 628, 633 n. 4, 769 P.2d 505, 510 n.4 (1987), *approved in Leazer v. Kiefer,* 120 Idaho 902, 906, 821 P.2d 957, 961 (1991).

This Court holds that Instruction 11 properly instructed the jury.

**2. Instruction 14-A—Mortality Figures.**

■ Instruction 14-A stated:

If you find that plaintiff is entitled to recover damages, you may ... consider along with the other evidence, the fact that under a standard table of mortality, of which we take notice without proof and which is to be taken as evidence in this case, the life expectancy of a female, age 31, is 50 years.... [T]his date may be considered by you in connection with all other evidence relating to the probable life expectancy of the individual here in question, including her occupation, health, habits, and other activities.

The Hospital asserts that the trial court erred by using a mortality table provided by an expert instead of that listed in the Idaho Code.[3]

In a civil proceeding, the trial court *"shall* construct [sic] the jury to accept as conclusive any fact judicially noticed." I.R.E. 201(g) (emphasis added). A court may take judicial notice of adjudicative facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." I.R.E. 201(b)(2). The trial court took judicial notice of a mortality figure admitted into evidence and contained in the testimony and reports of a life care planner and economist. The figures were uncontested. Therefore, the trial court was not only permitted, but required, to instruct the jury as to the judicially-noticed mortality figures.

This Court has examined the Hospital's other objections to the jury instructions and the special verdict form and finds them to be without merit.

**K. The Trial Court Erroneously Awarded Some Costs as a Matter of Right and Failed to Make Required Findings on Discretionary Costs.**

Within the statutory period required by I.R.C.P. 54(d)(5), Perry filed a memorandum of costs with the trial court requesting $12,838.55 in costs as a matter of right and $27,339.99 in discretionary costs. The Hospital filed an objection to the memorandum of costs. After a hearing, the trial court issued its order. The trial court disallowed $1,739.00 in costs as a matter of right and $7,337.18 in discretionary costs, giving Perry $31,102.36 in total costs. The Hospital objects to certain costs allowed by the trial court.

■ The award of costs as a matter of right and discretionary costs is subject to the trial court's discretion. I.R.C.P. 54(d)(1)(C, D); *Perkins v. U.S. Transformer West,* 132 Idaho 427, 431, 974 P.2d 73, 77 (1999). The party opposing the award bears the burden of demonstrating an abuse of the trial court's discretion. *Id.*

**1. Costs as a Matter of Right.**

■ I.R.C.P. 54(d)(1)(C)(8) allows reasonable expert witness fees for experts testifying at a deposition or trial, "not to exceed the sum of $500 for each expert witness for all appearances." Perry listed Dr. Han twice for testifying at two depositions, charging $500 for the first deposition and $488 for the second deposition. Because the trial court did not disallow the second charge as exceeding the amount allowed by the rule, it awarded $488 in error.

■ I.R.C.P. 54(d)(1)(C)(6) allows reasonable costs for various exhibits admitted in evidence, not to exceed $500 for all exhibits. The trial court allowed Perry's costs for printing exhibits. The Hospital contends that not all the exhibits printed were admitted into evidence. Because the Hospital did

---

**3.** The Appendix to Volume III of the Idaho Code provides seven different mortality tables, most dating from the 1940s and before. A few statutes within Title 41 (Insurance), but no other statutes, refer to some of these mortality tables.

**60**

not specify the number of exhibits admitted into evidence or the proportion of the cost of admitted exhibits to the total printing bill, it has not met its burden of demonstrating an abuse of discretion. We note, however, that Perry submitted $501 in printing costs, which exceeds the maximum amount allowed by the rule. Therefore, the trial court awarded $1 in error.

This Court has examined the Hospital's other objections to costs awarded as a matter of right. The Hospital has not carried its burden of demonstrating that the trial court abused its discretion in awarding these costs.

Therefore, we hold that the trial court erred in awarding $489 ($488 + $1) in costs as a matter of right. We remand for a reduction in costs by this amount.

### 2. Discretionary Costs.

■ A trial court may, at its discretion, award a prevailing party "necessary and exceptional costs reasonably incurred." I.R.C.P. 54(d)(1)(D). When ruling upon objections to discretionary costs, the trial court "shall make express findings as to why such specific item of discretionary cost should or should not be allowed." I.R.C.P. 54(d)(1)(D). The court need not evaluate the costs item by item, but must make express findings regarding "the general character of the requested costs." *Fish v. Smith*, 131 Idaho 492, 494, 960 P.2d 175, 177 (1998) (quoting *Roe v. Harris*, 128 Idaho 569, 574, 917 P.2d 403, 408 (1996), *overruled on other grounds by Rincover v. State, Dep't of Finance*, 132 Idaho 547, 976 P.2d 473 (1999)).

■ In awarding discretionary costs, the trial court did not make *any* express findings. Without explanation, it merely disallowed certain costs to which the Hospital objected. It did not describe the circumstances giving rise to its allowing or disallowing certain costs, nor did it state that it found the awarded costs necessary, exceptional, and reasonably incurred. *See Richard J. and Esther E. Wooley Trust v. DeBest Plumbing, Inc.*, 133 Idaho 180, 187, 983 P.2d 834, 841 (1999). The lack of express findings does not allow this Court to determine whether the trial court acted consistently with applicable legal standards and reached

its decision by an exercise of reason. *See Fish v. Smith*, 131 Idaho at 493–94, 960 P.2d at 176–77.

We remand to the trial court for specific findings concerning the discretionary costs disputed by the Hospital.

### L. We Decline to Award Attorney Fees on Appeal.

■ Perry asserts entitlement to attorney fees under *Rueth v. State*, 103 Idaho 74, 81, 644 P.2d 1333, 1340 (1982). *Rueth* awarded attorney fees to respondents pursuant to I.C. § 12–121 and I.A.R. 41. The Hospital brought some legitimate issues before this Court and did not pursue the appeal "frivolously, unreasonably, or without foundation." I.C. § 12–121. Therefore, this Court declines to award attorney fees on appeal to Perry.

### IV.

### CONCLUSION

Because the trial court committed no reversible error, we affirm its judgment. We remand for a reduction of $489 in costs as of right and for express findings on the disputed discretionary costs. Costs to respondent. No attorney fees on appeal are awarded.

Chief Justice TROUT, Justices SILAK, SCHROEDER, and WALTERS, concur.